UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

STEPHEN J. DUNN,

    Plaintiff,

vs.                                                              Case No. 10-13731

CCH INCORPORATED,                        HON. AVERN COHN

    Defendant.
_____/

**MEMORANDUM AND ORDER**
**DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT (Doc. 21)**
**AND**
**DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. 22)**

I. Introduction

This is a contract case. Plaintiff Stephen J. Dunn ("Dunn") is suing defendant CCH Incorporated ("CCH") claiming that CCH breached a Publishing Agreement regarding Dunn's authorship of a treatise on IRS Tax Practice and Procedure to be published by CCH. Dunn says CCH improperly terminated the contract. Dunn claims (1) breach of contract and (2) breach of implied covenant of good faith and fair dealing.

Before the Court is Dunn's motion for partial summary judgment as to liability and CCH's motion for summary judgment on liability and damages. While the parties believe that resolution of the motions revolves around the legal consequences of undisputed facts, there are disputed facts making summary judgment inappropriate. Accordingly, for the reasons that follow, the motions are DENIED.

II.  Background

The material facts as gleaned from the parties' papers follow.

A.  The Parties

Dunn is an licensed attorney who specializes in tax law and litigation.  He has written several articles, including a 2006 article in CCH's Journal of Tax Practice & Procedure.  Dunn is also an adjunct lecturer at the University of Michigan-Dearborn College of Business, where he has taught courses on tax practice and procedure and estate planning and taxation.

CCH is a legal publishing house.  It publishes tax and business law information products for corporations, accounting firms, and law firms.

B.  CCH's Development of the Expert Treatise Library

In 2009, CCH decided to create and publish a line of treatises (the "Expert Treatises Library") to supplement its existing tax and accounting products.  Before this, CCH had never published a treatise.  After researching the market in corporations and accounting firms, CCH believed that offering treatises could help CCH compete more effectively against its main competitor, Thomson Reuters, Inc. ("Thomson Reuters"), which has published a successful line of treatises for decades, called the "WGL Teatises."  CCH determined that some of its potential customers chose Thomson Reuters for other products and libraries over CCH because Thomson Reuters offered treatises as part of its line of products.  CCH decided that it would develop six new treatises from scratch and that those treatises would cover the topics of Federal Income Taxation of Corporations and Shareholders, State Taxation, Partnership Taxation, Consolidated Returns, IRS Practice and Procedure (P&P Treatise), and U.S.

2

International Taxation.  CCH planned to have at least three authors for each treatise: a practicing lawyer, an accountant, and an academic.

Mark Friedlich ("Friedlich") was assigned to oversee the development of the Expert Treatises Library.  Jennifer Codner ("Codner") was assigned to act as Acquisitions Editor -- her primary responsibility was to act as a recruiter for authors for the Expert Treatises Library.  Susan Frayman ("Frayman") was assigned to work as Managing Editor -- her primary responsibility was to act as the supervisor of the editors working on the individual treatises.  Maureen Bornstein ("Bornstein") was assigned to work as the Lead Editor for the P&P Treatise -- she performed the main editorial work on the P&P Treatise.

CCH projected sales for the entire Expert Treatises Library (all six treatises) for the first year of publication, assumed at that time as 2010, to be $494,662.  CCH also projected sales for the second year of publication, assumed at that time as 2011, to be $1,277,845.

In the summer of 2009, Codner began recruiting authors for the Expert Treatises Library.  She communicated with Michael Desmond ("Desmond") about being an author for the P&P Treatise.

### C.  CCH and Dunn's Relationship

#### 1.  Pre-Contract Events

In September of 2009, Codner was told by a colleague that Dunn might be a potential author prospect for the P&P Treatise.  Because Dunn was associated with the University of Michigan--Dearborn, Codner thought that he might fill the role of the academic for the P&P Treatise.  Codner contacted Dunn on or about October 2, 2009

3

and asked him whether he would be interested in possibly being an author for the P&P Treatise. Dunn indicated he was interested. Codner sent Dunn editorial guidelines drafted by the editorial team to help potential authors understand what CCH required for the Expert Treatises Library. The editorial guidelines emphasized the need for a comprehensive analysis of each topic and that CCH wanted the "author's 'voice'" to permeate each individual treatise. The guidelines also stated that the Expert Treatises were intended to "provide comprehensive analysis of a complex topics such as corporate taxation. Such coverage is expected to be many hundreds of pages in length, and may span several volumes."

Codner also told Dunn that CCH intended the P&P Treatise to compete directly with the Thomson Reuters treatise on tax practice and procedure written by Michael I. Saltzman (the "Saltzman Treatise"). CCH says the Saltzman Treatise is the leading tax procedure treatise in the marketplace and has been on the market for over 25 years. Although, as will be explained, Dunn believes that the Saltzman Treatise is not reliable.

As part of the author selection process, Codner asked Dunn to submit a sample chapter. In December of 2009, Dunn submitted a sample chapter on a topic he selected -- testimonial privileges ("Testimonial Privileges Chapter"). Bornstein reviewed Dunn's sample chapter and concluded that it was an acceptable as a starting point for the Testimonial Privileges Chapter, but that it lacked sufficient depth and breadth of coverage on many topics. Bornstein provided both general editorial comments and line-edits to Dunn. These comments included that the chapter needed to be more "treatise -like" and that Dunn needed to "expand discussion in areas he commented on with one or two lines – we would like more leads ins and conclusions." These

comments were communicated in an email from Codner to Dunn. Corder's portion of the email states in part that "[t]he general consensus is that you are a very solid writer."

Dunn responded to those comments by offering to revise the Testimonial Privileges Chapter and thereafter submitted a revised draft incorporating Bornstein's comments.

2. CCH and Dunn Enter into the Publishing Agreement

In February of 2010, Dunn and CCH executed CCH's Publishing Agreement[1] in which Dunn agreed to act as an author for the P&P Treatise. The meaning of paragraph 1 of the Publishing Agreement is at issue. Paragraph 1 provides in relevant part:

> If the Author has not delivered in form and content acceptable to the Publisher a complete manuscript and all permissions by the delivery date herein agreed to, including any delivery date pursuant to paragraph 8 with respects to any new edition of the Work, the Publisher may, if it so chooses, return all of the unpublished materials that have been submitted to the Publisher by the author and, at its sole option, terminate this Agreement by prior written notice to the Author without any liability whatsoever on the Publisher's part. Alternatively, the Publisher may, at its sole option, extend the manuscript delivery date or give the Author a reasonable amount of additional time to make changes or revisions acceptable to the Publisher (although the Publisher shall not be required to do so). Should the Author be unwilling or unable to meet the new delivery date or make changes or revisions acceptable to the Publisher in that time, the Publisher may return all unpublished materials as provided above and, at its sole option, terminate this agreement by prior written notice to the Author, without any liability whatsoever on the Publisher's part.

The Publishing Agreement also provided that the authors were entitled to royalties in the amount of 20% of net sales of the P&P treaties during the first full year and 15% of net sales each year after. The percentages were to be divided among the authors. In

---

[1] Dunn made one change to CCH's contract, deleting an indemnification provision. CCH agreed to the change.

addition, Dunn was paid $5,000.00 as an advance on royalties.

In the meantime, Codner was continuing to search for additional author prospects for the P&P Treatise and was communicating with Desmond-- who would have filled the attorney role -- and Jeffrey Frishman ("Frishman") -- who would have filled the CPA role.  After learning that Dunn was under contract, Desmond asked to see some of Dunn's articles.  Desmond also read Dunn's Testimonial Privileges Chapter.  Desmond and Frishman each had substantive and organizational concerns with that draft chapter.  Desmond, however, testified at deposition that he thinks he did not share his concerns with either Codner or Bornstein.  Desmond recalls that perhaps Frishman mentioned that he had concerns about the Testimonial Privileges Chapter to Codner during a phone call.

Bornstein was not aware of Desmond or Frishman's opinions on the Testimonial Privileges Chapter or on any of Dunn's other work or reputation.  Ultimately, in April of 2010, Desmond and Frishman each decided not to act as authors for the P&P Treatise. Desmond's concerns with the Testimonial Privileges Chapter was just one of many factors that led him to decline CCH's offer at that time.  Other factors included the time commitment required.

After Desmond and Frishman declined CCH's offer to be authors, Bornstein, Frayman, and Codner decided to ask Dunn to write additional chapters while Codner searched for additional author prospects to complete the author team along with Dunn. Dunn volunteered to write the chapter on tax returns ("Tax Returns Chapter") and submitted a draft outline of the Tax Returns Chapter (the "Tax Returns Outline") to Bornstein.

Bornstein provided comments on the Tax Returns Outline relating primarily to the depth and breadth of coverage of the Tax Returns Outline. Dunn agreed with Bornstein's comments.

On July 3, 2010, Dunn submitted a draft of the Tax Returns Chapter which Bornstein reviewed. Bornstein testified at deposition that she was "disappointed" with the Tax Returns Chapter as it lacked the depth and breadth of coverage that CCH required, particularly in light of her previous comments concerning the lack of depth and breadth of coverage on the Testimonial Privileges Chapter and the Tax Returns Outline. Bornstein testified at deposition that the Tax Returns Chapter was "not nearly as good as" the initial draft of the Testimonial Privileges Chapter. Specifically, Bornstein noted that his overview was two short paragraphs, his discussion was generally thin and without examples, his exhibits are references to forms and only one was filled out, there were limited examples and almost no commentary on how to navigate the return process, and that most of it was a basic discussion of the rules with very few footnotes. For example, Dunn's discussion concerning Gift Tax returns was: "Gift tax returns are filed on Form 709 U.S. Gift (and Generation-Skipping Transfer) Tax Return." Bornstein thought that a discussion on the gift tax required an explanation regarding the purpose and mechanics of filing a gift tax return rather than just a reference to the form.

Indeed, Bornstein felt that the Tax Returns Chapter was so deficient that it required a rewrite by Dunn and it would not be productive to provide line edits at that time. Bornstein shared her concerns and opinions with Frayman and they decided to give Dunn general comments about the need for greater depth and breadth of coverage along with an example chapter from another treatise being developed as part of the

Expert Treatises Library as a guide. Bornstein provided the comments and the sample chapter to Dunn.

Dunn did not offer to revise the Tax Returns Chapter as he had done when he received feedback on the Testimonial Privileges Chapter, nor did Bornstein request that he revise the chapter. Dunn responded to Bornstein's comments by saying in an email that "Tax Returns is not a very deep subject, except for the joint returns area. I'm not sure what we can do about it. Collections is much more cerebral." Bornstein responded to Dunn in an email, referring him to the Saltzman Treatise as "what we are trying to surpass." Dunn replied in an email that "I had the Saltzman treatise, but found it to be worthless and threw it out. I can access it at a library. I know I'm working in the cutting-edge issues in this area."

Bornstein communicated Dunn's response to Frayman and Codner. The editorial team felt that Dunn's responses showed that he was unwilling or unable to make the changes and revisions to the Tax Returns Chapter to make it acceptable to CCH. After consulting with the rest of the editorial team, Bornstein told Dunn to stop writing until CCH could secure the rest of the author team.

### 3. CCH's Decision to Terminate the Publishing Agreement

In the meantime, Bornstein, Frayman, and Codner consulted with Friedlich regarding the deficient Tax Returns Chapter and Dunn's reaction to Bornstein's feedback. During a meeting on July 14, 2001, Friedlich decided to terminate the Publishing Agreement. The meeting minutes state:

> Might need to make adjustments based on chapter material that was sent so far. The latest chapter is very thin, and not as much in depth as the first chapter which also needed the [sic] work. Decision to release Steve from his contract as

the team believes he won't be able to write up to this task. Sue, Jen, Mark, and Maureen to meet and discuss how to approach him and release him from the contract.

Codner continued to search for author prospects and reached out to Desmond, who gave Codner advice and recommendations on searching for potential authors.

On August 6, 2010, Codner emailed Dunn to schedule a phone call. The phone call took place on August 11, 2010. During that call, Codner told Dunn that CCH was terminating the Publishing Agreement and that he could keep the $5000.00 advance CCH had paid him. Dunn confirmed the conversation in a letter dated August 16, 2010 to Codner. On August 27, 2010, CCH sent a formal letter of termination of the Publishing Agreement to Dunn. The letter states in relevant part:

> pursuant to [paragraph] 1 of your contract dated January 28, 2010, CCH has the right to terminate the agreement when the author has not submitted manuscript in form and content acceptable to us. We are exercising that rights and returning your manuscript forthwith.

D.  CCH's New Projections and Actual Sales of the Expert Treatises Library

According to CCH, there were delays in developing all of the individual treatises in the Expert Treatises Library and because of changes in the marketplace due to the economic recession of 2009, CCH revised its 2009 Projections downward and created new projections (the "2011 Projections"). According to the 2011 Projections, CCH projected $230,046 in sales for 2011, well below the original projection of $494,662 for the first year. As of May 2011, three individual treatises have been published and the remaining treatises are currently at risk of further delay. Through May of 2011, the actual sales of the individual treatises in the Expert Treatises Library totaled only $5,997.

9

E.  Dunn's Lawsuit Against CCH

On October 20, 2010, Dunn filed his two count Complaint for breach of contract and breach of implied covenant of good faith and fair dealing.  Dunn alleges that CCH "materially breached the Publishing Agreement by terminating it, causing Plaintiff to suffer damages," and that "[i]n terminating the Publishing Agreement, Defendant breached its implied covenant of good faith and fair dealing, causing Plaintiff to suffer damages."

III.  Summary Judgment

Summary judgment will be granted when the moving party demonstrates that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  There is no genuine issue of material fact when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The nonmoving party may not rest upon his pleadings; rather, the nonmoving party's response "must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  Showing that there is some metaphysical doubt as to the material facts is not enough; "the mere existence of a scintilla of evidence" in support of the nonmoving party is not sufficient to show a genuine issue of material fact.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).  Rather, the nonmoving party must present "significant probative evidence" in support of its opposition to the motion for summary judgment in order to defeat the motion.  Moore v. Philip Morris Co., 8 F.3d 335, 340 (6th Cir. 1993);  see Anderson, 477 U.S. at 249–50.

IV. Analysis

A. Breach of the Publishing Agreement

1. The Law

The Publishing Agreement provides that Illinois law governs. Under Illinois law, "[a] complaint for the breach of a contract must allege the following elements: the existence of a contract, the plaintiff's performance of all contractual conditions required of her, the defendant's breach of the contract, and the damages that resulted from the breach." Finch v. Illinois Cmty. Coll. Bd., 315 Ill. App. 3d 831, 836, 734 N.E. 106, 110 (5th Dist. 2000). Also under Illinois law, a covenant of good faith and fair dealing is implied into every contract. Dayan v. McDonald's Corp., 125 Ill. App. 3d 972, 989-90, 466 N.E.2d 958, 973 (1st Dist. 1984). Dunn's claim for breach of covenant of good faith and fair dealing is not a stand-alone claim, but rather part of his breach of contract claim. Echo, Inc. v. Whitson Co., Inc., 121 F.3d 1099, 1105-06 (7th Cir. 1997).

The good faith requirement in publishing contracts comes from the implied covenant of good faith and fair dealing. Chodos v. West Publishing Co., 292 F.3d 992, 996 (9th Cir. 2002) (publishing contract that allowed publisher to terminate if the author submitted unacceptable work was not illusory because the implied covenant of good faith and fair dealing required publisher to exercise its discretion in good faith). The covenant of good faith and fair dealing requires a party vested with broad discretion to act reasonably and not arbitrarily or in a manner inconsistent with the reasonable expectations of the parties. Northern Trust Co. v. VIII South Michigan Assoc., 276 Ill. App. 3d 355, 367, 657 N.E.2d 1095, 1104 (1st Dist. 1995). It cannot, however, create new terms which do not exist in the contract. Id. Rather, the covenant is used as an

interpretative tool by Illinois courts. Id. Under Illinois law, a party cannot be held liable for a breach of the covenant of good faith where it acts pursuant to the terms of the contract. Metro Communications Co. v. Ameritech Mobile Communications, Inc., 788 F. Supp. 1424 (E.D. Mich. 1992) (applying Illinois law). Therefore, the question of CCH's breach of the Publishing Agreement and its obligations under the implied covenant of good faith and fair dealing are one and the same.

2. Interpretation of Paragraph 1

The parties disagree on the interpretation of paragraph 1 of the Publishing Agreement. As set forth above, paragraph 1 provides in relevant part:

> If the Author has not delivered in form and content acceptable to the Publisher a complete manuscript and all permissions by the delivery date herein agreed to, including any delivery date pursuant to paragraph 8 with respects to any new edition of the Work, the Publisher may, if it so chooses, return all of the unpublished materials that have been submitted to the Publisher by the author and, at its sole option, terminate this Agreement by prior written notice to the Author without any liability whatsoever on the Publisher's part. Alternatively, the Publisher may, at its sole option, extend the manuscript delivery date or give the Author a reasonable amount of additional time to make changes or revisions acceptable to the Publisher (although the Publisher shall not be required to do so). Should the Author be unwilling or unable to meet the new delivery date or make changes or revisions acceptable to the Publisher in that time, the Publisher may return all unpublished materials as provided above and, at its sole option, terminate this agreement by prior written notice to the Author, without any liability whatsoever on the Publisher's part.

Dunn says that this paragraph gives CCH the right to terminate the Publishing Agreement only if Dunn fails to deliver a completed manuscript by a deadline that is unsatisfactory to CCH. Dunn says that because it is undisputed that there was no deadline and because it is undisputed that Dunn did not fail to timely submit a "complete manuscript," he is entitled to summary judgment on his breach of contract claim because CCH undisputedly breached the Publishing Agreement.

CCH disagrees with Dunn's interpretation.  CCH says there is no temporal requirement and that the question of whether CCH breached the Publishing Agreement depends upon whether CCH acted in bad faith.  In other words, CCH focuses on the language that CCH could "at its sole option, terminate this Agreement" if Dunn did not "deliver[ ] in form and content acceptable to [CCH] …" and that "[s]hould the Author be unwilling or unable to meet the new delivery date or make changes or revisions acceptable to [CCH] in that time," CCH "may … at its sole option, terminate this agreement by prior written notice to the Author, without any liability whatsoever on the Publisher's part."  CCH argues that Dunn's interpretation - which essentially is that CCH could not have terminated the Publishing Agreement until Dunn failed to deliver a <u>complete</u> treatise that was unacceptable by the deadline for the completed treatise - contradicts the express terms in the Publishing Agreement.

The Publishing Agreement could be interpreted to link the temporal element - delivery of a competed work by a deadline - with CCH's right to terminate only if the work is not acceptable when delivered by the deadline.  Because it is clear that there was no deadline for the completed treatise, and Dunn had only submitted two chapters, it is not unreasonable to argue that CCH breached the Publishing Agreement by terminating Dunn's contract when it did.  However, this interpretation gives to much leeway to the author than what reasonably could be contemplated.  As CCH suggests in its papers, such an interpretation results in the untenable result that CCH could not terminate a contract, no matter how poor of quality an author's work is submitted, until the very end of the completed project.  CCH's interpretation makes sense because the Publishing Agreement says that "[s]hould the Author be unwilling or unable to meet the

13

new delivery date *or make changes or revisions acceptable to CCH* in that time." Under Dunn's interpretation, CCH could not terminate the Publishing Agreement until Dunn finished the entire treatise and turned in unacceptable work, wasting months of time and work. It is more reasonable that the Publishing Agreement allows CCH to terminate it if it receives unacceptable work that it does not believe can be revised to be made acceptable. Overall, Dunn is not entitled to summary judgment based on his interpretation of the Publishing Agreement.[2]

### 3. CCH's Good Faith

Dunn goes on, however, to argue that summary judgment is still appropriate because there is no genuine issue of material fact that CCH acted in bad faith. CCH says just the opposite–that it is entitled to summary judgment because there is no genuine issue of material fact that it did not act in bad faith. Both parties cite publishing cases from the Second Circuit, applying New York law.[3] According to CCH, the lead case in this area is Doubleday & Co. v. Curtis, 763 F.2d 495 (2d Cir. 1985). In Doubleday, the contract provided that Curtis would deliver manuscripts "satisfactory to the Publisher in content and form," a contract described by the Second Circuit as a

---

[2] Part of the problem with the Publishing Agreement as applied to this case is that it appears to be drafted to apply to a single submission, i.e. a single completed manuscript. The nature of the treatise project, as evidenced by the sequence of events, is that there are multiple submissions, i.e. chapter by chapter. Although CCH has not so argued, a reasonable interpretation would be each submitted chapter constitutes a "manuscript" within the meaning of the Publishing Agreement.

[3] As CCH points out, although Illinois courts have not interpreted this kind of language in a publishing contract, the principle of general contract law that a contract contingent upon the subjective satisfaction of one party can be terminated if that party is honestly dissatisfied, is found in Illinois case law. See Deltak, Inc. v. Shwartz, 119 Ill. App. 3d 119, 456 N.E.2d 187 (1st Dist. 1983).

"standard industry form." Id. at 497.  The Second Circuit noted that such contracts, which allow the publisher to terminate if the work is not acceptable as to form or content, have an implied good-faith requirement, which stems from the requirement that a party vested with discretion must exercise that discretion in good faith.  Id. at 500.  The Second Circuit held that "a publisher may, in its discretion, terminate a standard publishing contract, provided that the termination is made in good faith, and that the failure of an author to submit a satisfactory manuscript was not caused by the publisher's bad faith." Id. at 501.  In other words, the Second Circuit said that so long as the publisher terminates the contract due to its "honest dissatisfaction" with the work, there is no breach.  Id. at 500.

Assuming that this is the standard of good faith to be applied in publishing cases, the record shows that neither party is entitled to summary judgment.  Both parties suggest that the issue boils down to one question -- was CCH honestly dissatisfied with Dunn's work on the Tax Returns Chapter?  There is a clear dispute of material fact as to whether Dunn was unwilling or unable to revise the chapter he submitted to make it acceptable to CCH.  In other words, CCH's honest dissatisfaction is disputed.  Dunn revised his first chapter to CCH's satisfaction[4] albeit after having to make substantive revisions.  However, Bornstein, apparently did not believe that Dunn was willing and/or capable of making the changes necessary to have the ax Returns Chapter acceptable to CCH.  CCH did not offer Dunn an opportunity to make revisions, as it had done with

---

[4]Although CCH sent Dunn the Publishing Agreement after he revised the Testimonial Privileges Chapter, Bornstein testified at deposition that the chapter was improved but not yet ready to be published.

the Testimonial Privileges Chapter. While Dunn did not ask for an opportunity to revise the chapter, CCH simply told Dunn to stop working on the treatise and later terminated the Publishing Agreement. Under these circumstances, reasonable minds could differ on whether CCH breached the Publishing Agreement when it concluded that Dunn was unwilling or unable to make revisions that would be acceptable to CCH. In other words, there is sufficient doubt as to whether CCH was honestly dissatisfied with Dunn's work such that it had the right to terminate the Publishing Agreement.[5]

### B. Dunn's Damages

CCH also argues that summary judgment is appropriate because Dunn cannot establish damages. Damages are an essential element of a breach of contract claim under Illinois law. Finch, 315 Ill. App. 3d at 836, 248 N.E. at 101. Dunn is seeking damages for lost royalties and for lost business referrals. Given that liability and damages could be bifurcated at trial, the Court declines to make a ruling on Dunn's damages at this time. However, it offers the following as it may assist the parties in charting the future course of this case, including bringing it to a resolution.

As to lost business referrals, under Illinois law, lost profits may be recovered only when there are "criteria by which they can be estimated with reasonable certainty." Reliable Fire Equip. Co. v. Arredondo, 405 Ill. App. 3d 708, 719, 940 N.E.2d 153, 161 (2d Dist. 2010) (finding that plaintiff could not recover lost profits because it failed to prove that lost profits were calculable with reasonable certainty). Indeed, Illinois courts

---

[5]Dunn argues that CCH wanted Desmond to replace Dunn and Desmond also wanted to take Dunn's place as an author. This argument, however, is not borne out by the record, especially because Desmond never agreed to be an author.

"will reverse damage awards that are based on speculation or conjecture," such as where damages are based on "false assumptions or data." SK Hand Tool Corp. v. Dresser Indus., Inc., 284 Ill. App. 3d 417, 426-27, 672 N.E.2d 341, 348 (1st Dist. 1996).

At deposition, Dunn explained that the basis for his claim for lost business referrals as "informed speculation," stating:

> Q. And other than the fact that you have gotten, in your opinion, two matters and the possibility of a third as a result of the 30 or so articles that you have written, you have no other basis for estimating or believing that you would -- what you might have earned had you continued to have been involved in this treatise?
> [. . .]
> A. But other than those matters, no, I have no other basis to say that.
> Q. Other than that, it is speculation on your part?
> A. Other than that, I would say informed speculation . . . .

Deposition of Stephen Dunn 166:4-10; 167:2-5. As CCH notes, however, "a mere surmise or conjecture cannot be regarded as proof of an existing fact or of a future condition that will result." Brown v. Chicago & N. W. Transp. Co., 162 Ill. App. 3d 926, 936, 516 N.E.2d 320, 327 (1st Dist. 1987) (reversing jury award of damages based on future earnings because such earnings were too speculative). Furthermore, Dunn has not offered any evidence of the quantity or monetary value of such referrals. Thus, it would appear that any possible referrals that he might have received as a result of being a co-author of the P&P Treatise are too speculative to be recoverable as a matter of law. Here, discovery has closed and Dunn has not pointed to any evidence of the quantity or monetary value of his alleged lost business referrals. The only evidence is, in Dunn's words, "speculation." Thus, it seems unlikely Dunn can recover for lost business referrals.

As to his claim for future royalties, CCH says that the P&P Treatise and the

17

Expert Treatise Library is a "new business venture" for the company and that under Illinois law, evidence of projected profits of new business ventures attempted by an established business cannot support a damages award based on lost future profits. TAS Distrib. Co., Inc. v. Cummins Engine Co., Inc., 491 F.3d 625, 634 (7th Cir. 2007) (affirming district court's order granting summary judgment in favor of defendant because damages for lost royalties related to a new product were too speculative and noting that "Illinois' new business rule can apply when an entity, while established in the field, markets a new product"). CCH explains that the P&P Treatise was an entirely new product for CCH, being built from the ground up and, to this date -- much less on August 11, 2010, the date Dunn claims CCH breached the Publishing Agreement -- has no record of sales or profits because it has not been released. CCH also says that it is undisputed that the Expert Treatises Library itself was an entirely new business venture for CCH. CCH had never before published treatises and had no track record for the sales or profits associated with treatises of any kind. CCH also says that it is undisputed that Dunn's royalties would have been based exclusively on net sales of the P&P Treatise. The Publishing Agreement provided that the entire author team for the P&P Treatise would have collectively been entitled to royalties of 20% of net sales in the first year of publication and 15% of net sales thereafter. Because there are no established record of sales, CCH argues that royalties dependent upon those sales are too speculative under Illinois' new business rule.

  Dunn, however, says that his royalty damages are not speculative. He first relies on historical sales of the Saltzman Treatise as a basis for future sales of the P&P Treatise, citing Milex Products Inc. v. Alra Labs., Inc., 237 Ill. App. 3d 177 (1992), Tri-G,

Inc. v. Burke, Bosselman & Weaver, 222 Ill. App. 2d 218, 248 (2006) which hold that a similarly situated business can be used as a proxy for future profits. In Milex, the court allowed evidence of sales of several competitors of a new business to support a claim for damages because the plaintiff presented "credible" expert testimony at trial regarding the market analysis and how a new product in that particular market would likely fare. 237 Ill. App. 3d 177, 193, 603 N.E.2d 1226, 1248 (2d Dist. 1992).

Dunn's argument is not particularly persuasive. As CCH points out, while it may established in the publishing field, the venture into the treatise market was new. Illinois law seems to suggest that the new business rule applies in such a circumstance. See TAS Distrib. Co., Inc. v. Cummins Engine Co., Inc., 491 F.3d 625, 634 (7th Cir. 2007) (distinguishing Milex and affirming district court's order granting summary judgment in favor of defendant and noting that "Illinois' new business rule can apply when an entity, while established in the field, markets a new product"). Moreover, discovery has closed and Dunn has not designated an expert. Overall, using the Saltzman Treatise as a model for Dunn's damages is problematic.

Moreover, Dunn's reliance on the 2009 sales projections is equally debatable. The 2009 projections were created without any track record of sales of this brand new business venture and before any of the treatises were developed, are arguably are too speculative and have been proven inaccurate by actual sales. As CCH explains:

> First, the treatises in the Expert Treatises Library have not been released as anticipated by the 2009 Projections. Second, the individual treatises were intended, under the 2009 Projections, to be rolled out in the marketplace at the same time in order to leverage the entire Expert Treatises Library as a sales tool. However, the individual treatises have been so uneven in their development that they are being published one at a time. Moreover, the actual sales of the treatises that have been released are a small fraction of the sales anticipated by

the 2009 Projections. Where the 2009 Projections hoped for $494,662 in sales for 2010, the projected first year of publication, actual sales for five months of 2011, the actual first year of production were $5,997.

In the end, even if Dunn is able to establish liability, the amount of damages he would be able to recover is very likely to be far lower than the over $600,000 he is seeking.

## V.  Conclusion

As explained above, reasonable minds could differ on whether CCH terminated the Publishing Agreement because it was honestly dissatisfied with Dunn's work. Because Dunn was not given an opportunity to revise the second chapter and CCH simply told him to stop working altogether, following up later with a termination letter, reasonable minds could question whether CCH's actions were premature.  While a full exposition of the facts at trial may show CCH acted appropriately, there is sufficient doubt in the record so as to prevent summary judgment in CCH's favor.

SO ORDERED.


Dated:  November 30, 2011            S/Avern Cohn
                                     AVERN COHN
                                     UNITED STATES DISTRICT JUDGE


I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, November 30, 2011, by electronic and/or ordinary mail.

                                      S/Julie Owens
                                     Case Manager, (313) 234-5160